Good morning, Your Honors, and welcome, Judge. My name is Peter Van de Messer, and I represent the defendant in this case. This is a very unique fact pattern. We're not going to find any Ninth Circuit authority on how to treat sovereignty activists when they open, when they perform warrantless searches. The question comes down to about five or six Ninth Circuit cases, especially two in the last couple of years, the George v. Edholm case, which you sat on, Judge Wardlow, and the Mozzarella case in 2015. But probably the most significant case, which is distinguishable, admittedly, in some ways, is the 1981 case of Walder. Even though that's a fairly old Ninth Circuit decision, it's been repeatedly cited, not only in Ninth Circuit decisions, including Mozzarella and George, but also in a lot of treatises. That has been cited in circuits across the country. It's important to look at the basic principles, because we are not going to find a case where the FBI talked to some sovereignty activists who had created their own badge and held themselves forward as the law enforcement wing of a Polynesian kingdom of Atui, and subsequently, four hours after talking to this FBI agent, Judah Penn, performed a warrantless search on a common carrier crate, which obviously is of great concern to everybody in terms of setting a precedent in this state. Counsel, do you have any authority for the proposition that the FBI agent had some sort of affirmative duty to tell the marshals, don't go break the law, don't go conduct warrantless searches? That's exactly the question Judge Watson asked Tommy Otake at the 2015 hearing. Clearly, I do not. What I have is a series of cases that talk about the importance of warnings given to people once the state or federal official knows that there's going to be investigations or conduct that is improper. And in this case, we not only have... Well, in this instance, once that happened, they did tell, when they said, should we follow him or something like that later on, they said, absolutely not. So when it got specific, they did tell them not to do it. Well, first of all, that came after the search. I know that. But what I'm saying is that at this earlier juncture that you're talking about, they didn't know they were going to go do anything in particular, or even anything. Excuse me, Your Honor. They certainly did. They had two individuals who represented themselves to be law enforcement officers. They called themselves federal marshals, Hawaii federal marshals. They had a badge. They had IDs. They asked to collaborate with the FBI. When they called the FBI four hours later, and it's not a coincidence this happened the same day that they met with the FBI, when they called the FBI four hours later, they sent an email that said, let me know as soon as possible on what we can do in collaboration with you. The FBI agent testified that what that individual met was that they were working together with the FBI. Now, the question is whether there's an obligation when someone shows up at the FBI and says they're a law enforcement... Excuse me. Excuse me. Okay. All right. Was... Well, never mind. Go ahead. Say what you want to say. I didn't mean to interrupt your train of thought. I think there's a problem with hearing. I'm sorry? I'm saying I think maybe you didn't hear Judge Berzant was trying to interject a question. That's all. Okay. Everybody should speak a little louder. Yeah. I'm not that great at hearing, and so I hope I didn't go over to you. Okay. I don't know what I was going to say. The point... I started off by saying there's no authority. Okay. But what I also argued, and I think it's true, is that there are various principles in these cases that talk about warning people. So what should... What, in your view, should the FBI agent... Is that Agent Pint who met with them? That's right. Judah Pint. Okay. So what should Agent Pint have said? I mean, should he have said, no, you can't act as marshals. You have no lawful authority. And what's your... Let's start with the badges. If someone shows up with a badge made by a badge company that says that the holder of the badge is a federal marshal, you tell them two things. You say, I'm not collaborating with you because you have no law enforcement authority, but you also say that it is a felony to impersonate a federal officer. It's also a state felony to impersonate a state officer. Well, counsel, the badge, in addition to saying federal marshal, also said on it, of the Polynesian kingdom of Atui. I'm not sure how you pronounce it, but it said that on the badge in the picture you introduced, your predecessor introduced into evidence, correct? You have four separate officers in this case who said they thought these were real federal officers. Two of those officers, Darren Lee and Apollo Chang, said they still believe they were US federal marshals after they saw the badge. Can I ask you a question? That's in the answering brief. They acknowledged that, that four separate people thought these were real US marshals. Suppose we didn't agree with your argument that this initial contact was sufficient. What else do you have? What about the later period? What about the what? Later period. Okay. I think the single most important document in this case is Judah Pence report. It was written 12 days after this search occurred, and it specifically has the language. He requests photos of the marijuana and the shipment documents. He communicates with other law enforcement. He does not tell the individuals that they should not have conducted a warrantless search and that they should not do it in the future. By the way, that's also true of the HPD officers that came to the scene. No one in the record before this court, either state or federal, ever told these two individuals before or afterwards not to use a badge, which fooled two of them. But what about the question of the timing? I had thought before you started arguing that this case turned to the question of whether or not the either Chang, probably Chang, actually directed the search. Is that not true? That's true of the second hearing. The first hearing involved the FBI. I know, but it doesn't matter what hearing we're talking about. I want to know what's going to happen on appeal in this case. Well, in this case, we're claiming that the lower court's finding that Judge Chang, I'm sorry, that Apollo Chang was told during the initial call that there was marijuana was clearly erroneous. And the best evidence of that is Judah Pence's report. That report was 12 days later, okay? But counsel, Officer Chang or Sergeant Chang specifically testified that in his first call with the marshal, he was told that they had found marijuana. And Judge Watson, who had the ability to observe the credibility of all witnesses, several times said that he credited what Sergeant Chang said on this point, and he specifically did not credit or believe the testimony of the marshal. So why would, when Judge Watson had the ability to observe the credibility of all of the witnesses, why would he have the right to say, I believe one but not the other? He does. The only thing I'd observe is that he did not, in that discussion, cite Judah Pence's report. In Judah Pence's report, Kama told him that he had just cut open the package at 345, which according to the phone records was an hour after he first spoke with Chang. That was, that report was prepared. There was absolutely no reason for Kama to lie to just open that. And, and it is, it's flatly inconsistent with Chang's claim. Chang never prepared a report, which is a violation of police procedures. He told the prosecutor before the first hearing that he had had contacts with Kama before the warrantless search. And, and that was not disclosed to the defense. That's the reason there was a second hearing. There was little or no justification for finding that Chang somehow was told about the opening, because it's flatly inconsistent with not only the Judah Pence report, but also the search warrant affidavits that were issued a week after the Judah Pence report, which are, they are quoting Kama as saying, I opened it and I opened it at 345. At the very top of the Judah Pence report, it says at 345, I was called by this individual. Now that report did two things. It not only showed unequivocally that this was open to 345 and therefore Chang is lying. It also confirmed that Judah Pence set up an arrangement four hours earlier, working with these law enforcement people, and the two people that showed up at the scene, Lee and Chang, were convinced these were U.S. Marshals. Whether it's the small print on the badge says, says Tui, obviously didn't affect those two people. Kama testified under oath that he didn't open the boxes, correct? Yes, that's correct. And the judge didn't believe him? In the first order, that's correct. I agree. Listen, the evidence isn't perfect in this case, but I think the Judah Pence report is, and the Judah Pence report is a very clear, straightforward report, and there's no reason why Kama would have lied to him, calling him from the scene, trying to get law enforcement officers to come over there. There's just no reason why he would. And there was all kinds of reason for Chang to lie, because he essentially asked two people who he thought were U.S. Marshals to conduct a warrantless search before he came to the site. I want to focus as much as I can on that 10-minute interview. The fact that it's 10 minutes does not take away from the fact of what he was told, what he acknowledged he was told, and what is covered very clearly in the, in the report that he filed. There's nothing in that report that says that Kama told Pence, Chang told me to open the crate, or anything like that. No, of course not. And we acknowledge that from the first day. I'm not saying that's not a good question, because that would really be the nexus in most cases. That would be the, that would be the important question to ask if this was a freight clerk, or if this was a airline employee. But this is a different situation. If you show up in front of the FBI, and show them a badge that says Federal Marshal, and tell them that you are the law enforcement wing, and you want to set up a liaison with the FBI, it's not the same. But how does that connect to the telephone calls with Chang? Chang hadn't seen this badge, or, or anything else. It doesn't, Your Honor. There's two separate approaches. I understand. There's the state, and there's the feds. Right. Okay. The first hearing, in itself, presented a very thorough argument, why there was an affirmative duty to discourage these officers. These officers showed up, and said, here's what we do. What do you think? And when the FBI said, no problem. Call us if you have any evidence. We're happy to collaborate with you. And when he, in fact, collaborated with him. That's what the FBI said, those things. Pardon? The FBI said, we're happy to collaborate with you, and show us any evidence. What the FBI said was, here's my card. Call me if there's any evidence. And the, and Judah Pent acknowledged that when he got an email from these Federal Marshals at the scene, and it's attached to his report, I invite you to look at it. It's an email from Kama, and it says, again, let me know ASAP on what we can do in collaboration with you. The judge, Judge Watson, found in the first hearing that government agents did not direct the private search. He, in fact, said it was clear that they didn't. Yes? Say that again. In the first hearing, Judge Watson found, based on the evidence presented in the first hearing, which, as you say, involved the FBI, that it was clear that the government agents did not direct the search. Oh, and, and we never contested that. I absolutely agree. The way I look at the, at the judge's determination in the first hearing is that it's a matter of law, reviewable de novo. There's no dispute about what occurred in front of Judah Pent. Both sides testify the same. If you look at the judge's ruling, he even says that, page four, first order. I, there's no dispute as to what occurred at Judah Pent's office that morning. All right, counsel, you're well over your time. We'll give you a minute for rebuttal, but let's hear what the government has to say. Thank you. May it please the court. Good morning. Tom Muehlek for the United States. The United States' position on this, and welcome, Judge Pent. Excuse me. The United States' position is this, that the lower court, the district court, did not clearly err in its findings as to either hearing on the motions expressed, as to both its orders. The court found that the meeting with the TUI marshals, with the FBI Special Agent Judah Pent, Judah Pent did not acquiesce or know that the marshals were going to go out and conduct law enforcement operations, conduct searches, do arrests. Interested in seizing any, or in searching any, for contraband or drugs. He was polite. Agent Pent was polite. He, he met with them about ten minutes outside the FBI perimeter. Outside. Is there actually a kingdom of a TUI? I believe there is, Your Honor. Is there a place? The Polynesian Kingdom of a TUI. Okay. Along with other sovereignty groups, I believe. Is there a place, I think she's asking. Yeah, a place. Within or within Hawaii? Beyond Hawaii? My limited understanding of this, Your Honor, is it started on the island of Kauai. That's, but that's, and that's what I've been told by people that have more information. I've not studied it. It is one of, again, my understanding, other sovereignty groups in the, in the Hawaiian archipelago. And all of the events in this case took place where? The, the, I'm sorry? The events in this case took place where? In Honolulu, out on the island of Oahu. Okay. In Honolulu? Well, the, the meeting with the FBI agent is in Kapolei, which is west of here. They have, it's out at Barbara's Point, the old Naval Air Station. The FBI has a new, new, relatively new, five years, I guess, standalone complex surrounded by the perimeter fence with, that's where they've been since they moved from the federal building. Okay. On the fourth floor of the federal building. They went on a building spree about five years ago. Well, they, they, they are out there and they have a, quite a large facility. Okay, so we have these two people from an organization that quite probably the FBI agents are aware of? He was, he knew nothing of this. He knew nothing of the Polynesian Kingdom of Vitui. He had, Agent Pent testified that he was not aware of this group, but being an agent, a professional law enforcement officer, went outside, met with them outside the security area, talked with him about 10 minutes, told him the SAC was not available to meet with them. He was, Pent was the duty officer that took complaints and telephone calls in, in addition to his normal investigative duties that day. He was polite. He didn't engage them in some sort of argument or about the, the constitutional of the legal underpinnings of the sovereignty movement. He got some information from them. He saw that they, they had a badge. The badge is correct. It says the Polynesian Kingdom of Vitui, which Judge Watts, the district court below has found to have, in the inner seal or in the, in the circle, have the Polynesian couple in traditional Polynesian garb. It does not say United States. It does not say United States Marshal Service. It does not say Deputy United States Marshal. It says Hawaii Federal Marshal, Polynesian Kingdom of Vitui. And Pent had no idea, no inkling that the people were going to use this badge to go out and do law interdiction or searches or arrest people. And when he did learn of that after the warrant, as Judge Berzon pointed out, he stopped them. He said, don't, don't detain them and wait for the law enforcement to come. And then he contacted the special agent, Tracy Dockery, the FBI at the high-intensity drug trafficking area in downtown Honolulu to get a marked unit to come out. There was no encouragement from Agent Pent for them to do anything. There was no inkling that they were going to do anything. He didn't have the slightest knowledge that these people were going to go out and flash badges, arrest people. As far as he knew, he was being polite to people that said they had a status. They were interested in this status within their, their sovereignty group. This is, this is... The stronger argument to me is the Chang involvement and the inferences that flow from the series of phone calls at that point when they, we know that when the, the two, Camu, Cama and when the two, um... Cama and Troxel, who was also named as Cahalavai, Your Honor. Those two, when they got the box, um, because the driver was suspicious, right? The driver... Lint Christensen. Right. He became suspicious. And so then they gave the box to, somehow, I don't know how these two officers somehow got involved with Christensen. But there's a series of phone calls with the local police. And that's the part, that I think is a stronger argument, factually. Let, let me try to see if I can answer the court's questions or what our position is. The position is, and the Chang, Apollo, Sergeant Apollo Chang of the Crime Reduction Unit, when he first got the call from the Hawaii Federal Marshal, who needed assistance because they had a crate or pallet of marijuana. And no one was helping them. No one was returning their calls. And from that, uh, Apollo Chang reached, he was coming into work later that day, hadn't started work. He reached out for his, uh, after he found out, he did ask the question, how did you contact me? Or how did you get my, my cell phone number? And he reached out for his people, because Chang was in charge of the crew unit. He was a sergeant. And he reached out for Officer Charles Resentes. Um, I think there was a Jared Fernandez he reached out for. He talked to his major, Major Saito, to see if the people could come, if he could do this, if he had permission to do this, because he hadn't come to work yet. And it would, of course, involve overtime, because they had to come into work and, and do this sort of thing. He, then he reached out for additional information from people. Uh, another I.U. was an officer I.U. to see if he would work. And then he reached out for people that he knew in, in narcotics and vice officers to get information on how to handle this pallet or crate or large amount of Mr. Kama testified twice and found his testimony to be inconsistent with his own declaration of September 7th of that year. It was inconsistent with his prior testimony at the first hearing. It was, uh, he hadn't, he had bad recollection, or he had no independent recollection. He had, he had to testify almost being led on the, on the witness stand. Uh, by using his declaration, he couldn't recall the name of that individual that he had dealt with before on some U.N. matters. Well, he, he had no report. That was the audit chain. He, he, your Honor, he did not have a report. Um, he explained why he didn't have a report. He explained that he didn't take the case. He was marijuana, seized the drugs, and, and did write the report. And he explained that, that even the, the HPD regulations, the way he read them, uh, did not require to write a report. That it was not a crime scene, that he was doing it merely to assist another agency. Um, the, the United States position is this boils down, and I, and I, and I should address, it was, it was asked, the government didn't turn over a, a, um, uh, or didn't disclose the contacts with Apollo, Sergeant Apollo Chang until afterwards. The, the, this, the United States handled the issues that were raised by the defense, and they were raised piecemeal. We responded to those issues, and we believe they were raised piecemeal because the attorneys, the defendant had a number of attorneys. They came and went. And as that second issue was raised, the state search warrant, or the involvement of the state, Apollo Chang, HPD, in the search warrant, which was the, they raised that, and then, uh, Judge Watson ordered the, the, uh, the, to be reopened. Um, that was raised, and, uh, Apollo Chang testified. And Apollo Chang testified that, that, that he, he, you know, always, from, from, that he did from the very first call, uh, understand that it was marshals, Hawaii federal marshals, with a crate of marijuana or a pallet of marijuana that they'd already found, and they needed assistance. Uh, we disclosed that to the defense and the, prior to their, uh, second argument, second hearing, um, and they used that in examining, uh, Mr. Apollo Chang, Sergeant Apollo Chang. They had both his cell phone records from T-Mobile, which we'd just gotten, from Mr. Chang, and which he had just gotten. That's, that's, that's outside the record, but I wanted to address it. And also, his notes, or notations, on, that Apollo Chang had made on his cell phone records, explaining, um, who he called, and, and who those people were, and then, and then he testified as to why he called them. It, it, it wasn't trying, somebody trying to hide the ball. We were responding to the issues that were raised piecemeal by the defense, as the defendants, uh, attorneys, um, sometimes disagreeing with each other, at one point being actually critical of a, of an attorney earlier in the matter. The defendant had eight attorneys in this matter, starting out, uh, from the federal public defender on to, uh. A small fact, but why did Christensen reach out to the suspicious crate in the first place? There were two different stories on, on, on, that were given. Initially, Christensen, Clint Christensen was a member of, of the Polynesian, uh, Kingdom of Atui. Oh, he was a member. He was also a marshal, and he was the driver of the truck, the express movers truck. The first story given by Mr. Akama, Samson Akama, the marshal, um, was that, um, he had gotten a call, uh, he was with Troxel, Timothy Troxel, the other marshal, Mr. Kahalavai, is his name also. Uh, he had gotten a call from Clinton Christensen, and Christensen was being followed, and they were concerned for his safety. That was the big concern. The, the life is precious, I think, Akama, uh, uh, uh, Samson Akama testified to. They went to him, and at that point, there was a suspicious crate, and that's when the judge found that Mr. Akama's testimony about he didn't see who opened the crate, uh, he didn't open the crate, uh, he, I asked him at that first hearing, did Troxel open the crate? No. In answer to Judge Wardlaw's question, though, Christensen was a member of the kingdom, and he viewed these others as his super, superior marshals? Yes, because Troxel Kahalavai was the head marshal for Oahu, and Samson Akama was the assistant to the head marshal for Oahu. And Clint Christensen was also a marshal for the Polynesian kingdom, uh, Polynesian kingdom of Atui, I think I misspoke, but Polynesian kingdom of Atui. They were all marshals. Kahalavai, or Troxel, was head for Oahu, uh, and Clint, uh, and, uh, uh, Samson Akama was assistant to the head marshal for Oahu. All right, counsel, I think we have your argument. I'll go to the opposing counsel a minute more. Thank you, Your Honor. Thank you. Um, quickly, uh, Judge Bennett, on your question of, uh, uh, did he, did Judah Pint direct the individuals to conduct an investigation or a search warrant? Uh, it, it, it's the quote from Walder. While DEA had no prior knowledge that the particular... Sorry. ...conducted and had not directly encouraged it, Rivard opened the package with the requisite mental state of a government agent. But, but Walther talked about, we emphasize the narrowness of our holding dependent on the trial court's finding of extensive prior contact between the, uh, airport guy who was the informant and the DEA, correct? Yes. And, by the way, you could also add because, uh, he had been offered rewards. I agree. But when you consider whether or not there's a requirement to discourage, which is also language from Walther, we started with Walther. Walther is distinguishable. I acknowledge that. But it also says that even where the DEA had no prior knowledge of a particular search and didn't directly encourage it, if the package was opened with a mental state of helping the government, it could still be suppressed. And here's what Judge, uh, Watson ruled twice. Comma opened that package to help the FBI. That was in both the first order and the second order. There's two prongs under the Reid case. What's the second one? Pardon? What's the second one? The second order had to do with this, with this. No, the second prong. Oh, the second prong is as, just as I stated, that, that the, the, the private party opening the package has to do so in order to help law enforcement. Okay. What's the first prong? The other one is that the, that the, that the government has to have some connection to this. Yes. Either acquiesce or direct. Those two things, alternatively. That's what Mozzarella says most recently. Yes. And acquiesce is what we're focusing on. It's what, it's what Judge Watson focused on. And I, I'd argue that it's a question of law as to whether, given the circumstances that occurred with Judge Penn, I'm sorry, with Judah Penn, whether or not that there was an obligation to affirmatively discourage officers, not, again, not freight clerks, not airline employees, not baggage handlers, but people coming in and showing badges. Yeah, so Judge Rosano has a question. I'm sorry? I'm sorry if you, you don't seem to be able to hear me. Most people can. But in any event, the, I'm, I'm a little baffled by the fact that you're, you have in your briefs a main, a point that goes on for many pages claiming that the district judge found, was, had a clearly erroneous finding that the crate was opened before the Atui marshals arrived at Royal Cunia. And A, I'm not sure why that's relevant, but B, you haven't said that at all today. And looking at the order, it doesn't seem to be such a finding. I agree. I'm sitting there aware that I hadn't raised it. But there is no such finding in the order. I looked in the order. Yes, there is a finding clearly in the order. And, and I will say this, that I think it's at page four. No, it's not. It's at page 17. The documents over there. The judge essentially held that because Kama called 9-11 as soon as he arrived at Royal Cunia, that he, that he must have known by then that there was already marijuana in the packet. And therefore, it must have been open prior to his arrival. That's what the judge found. Now, we take the position that if that is clearly erroneous, this court must reverse because the court relied on that finding in making. Can you show me where the finding is? Okay. It's the whole first argument, of course. Let's see. I show this at page 32 of volume three of the excerpts of records. And what it says is Kama knew, not merely suspected, that the crate contained marijuana by the time he arrived at Cunia Golf Course. The only way he could have known that is if the crate had been opened by that time. What that claims, which wipes out all of our suppression arguments, because obviously the only person who could have opened it if it wasn't, if it was open before Kama and Kyle Holloway arrived, is Christensen. Christensen didn't talk to Pent. Christensen didn't call Chang. There's no connect, there's no argument for suppression whatsoever if this finding is correct. And this finding is clearly erroneous. And we've taken the position that either if you find this finding is correct, there's no appeal. If you find this finding is clearly erroneous, which it clearly is, then you've got to reverse because the judge relied on a clearly erroneous finding. Now, it's inconsistent with Pent's report. No one testified to this at the hearing. In other words, he does this by sort of osmosis. There's absolutely no evidence that it was open before. If you look at the Pent report and also at Pent's testimony, it absolutely says that Kama explained that they received a tip from the driver of the Express Movers truck, who was also a marshal of the Kingdom of Atui. This is in the third volume of the Exhibit of Records, page 189. The driver observed suspicious activity. Clint. After receiving the tip, Clint, Kama, and his partner met the driver at Royal Kenia to further investigate. The driver opened the truck and allowed Kama access. Kama then cut open one of the boxes. That's what Pent's report says. That's directly contrary to what this judge just found here. As I pointed out a couple of pages later in my brief, the factual basis for the plea presented by the state was flatly inconsistent with this. What he argued in his factual basis when we tendered a plea is that after Kama arrived, the crate was open. This judge made a clearly erroneous finding, and I confronted him with it at the bail hearing. And I said, this is a big part of the reason we're appealing. And his comment was, even if that's wrong, there's still no suppression. The problem is... That's true, isn't it? No, it's not. Because as long as it was open before he talked to Chang, it doesn't matter whether it was before or after he arrived there. If you decide that the pen... I'm not just signing anything. Or that the Chang phone calls meant nothing, then that's true. It doesn't matter when it was open, because you're taking the position that the government's arguing that there was, you know, no obligation for any of these people to tell these people not to operate with false badges and fake IDs. Like I said, which two of them bought. But if you start with that finding, then it doesn't make any difference. And we don't know, based on that finding, what caused the judge to deny the motion to suppress. All right, counsel. You're well, well, well over your time. And I want to thank you very much, both counsel. Thank you for the extra time. For your argument today. And so U.S. versus Toyofuko will be submitted.
judges: Wardlaw, Berzon, Bennett